**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ERIKA BEASELY and LORA MEYERS, individually and on behalf of others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| GC SERVICES, L.P., | ) ) ) |
| Defendant. | ) |

Case No. 4:09-cv-01748-CDP

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION**
**FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION**

Respectfully submitted,

GC SERVICES LIMITED PARTNERSHIP

By: _____/s/ Arthur J. Rooney_____

       Noah A. Finkel (*admitted pro hac vice*)
       Arthur J. Rooney (*admitted pro hac vice*)
       SEYFARTH SHAW LLP
       131 South Dearborn Street, Suite 2400
       Chicago, Illinois  60603
       (312) 460-5000
       e-mail: nfinkel@seyfarth.com
           arooney@seyfarth.com

       Frank X. Neuner, Jr.
       Jennifer Chierek Znosko
       SPENCER FANE BRITT & BROWNE LLP
       1 N. Brentwood Blvd., Suite 1000
       St. Louis, Missouri  63105
       (314) 863-7733
       e-mail: fneuner@spencerfane.com
           jznosko@spencerfane.com

Dated:  May 17, 2010           **ATTORNEYS FOR DEFENDANT**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     FACTUAL BACKGROUND ...................................................................................2

    A.      GC Services' Business Operations ............................................................2

    B.      GC Services' Timekeeping Polices Prohibited Unpaid Work ..................3

        1.      GC Services' policies and training ............................................3

        2.      Enforcement of policies ............................................................4

    C.      Account Representatives Use An Electronic Timekeeping System To Record Their Hours Worked ....................................................................6

        1.      Different call centers use different timekeeping systems ...........6

        2.      The timekeeping practices of account representatives vary .......7

        3.      When account representatives are allowed to clock in to the timekeeping system varies ........................................................7

        4.      How long it takes account representatives to clock in varies .....8

    D.      The Log-in Grace Periods Available To Account Representatives, If Any, Vary ..............................................................................................9

    E.      Account Representatives Have Different Work Schedules ...................10

    F.      When Account Representatives Are Allowed To Enter The Call Center, Go To Their Work Area Or Desk, And Start Working Varies .............11

    G.      Account Representatives Have Different Job Duties And Use Different Work Systems ........................................................................................12

    H.      Account Representatives Are Subject To Different Job Expectations .................14

    I.      Account Representatives' Pay Varies ...................................................15

    J.      The Method GC Services Uses To Charge Clients For Work Performed By Account Representatives Varies ......................................................15

III.    ARGUMENT ........................................................................................................16

    A.      Conditional Certification Is Not Automatic ..........................................16

B.  Plaintiffs' Cannot Establish That The Account Representatives In The Proposed Nationwide Collective Action Are Similarly Situated..........................19

  1.  Plaintiffs have not identified a single decision, policy, or plan.................20

  2.  Statistical analysis of relevant data establishes that even the named and opt-in plaintiffs are not similarly situated ...........................................25

  3.  Declarations submitted by GC Services show significant differences among the potential class members ..........................................................29

C.  Plaintiffs' Proposed Collective Action Is Unmanageable ....................................32

D.  Plaintiffs Have Not Established That Putative Class Members Are Interested In Participating In This Lawsuit .........................................................................33

IV.  CONCLUSION.....................................................................................................34

# TABLE OF AUTHORITIES

## CASES

*Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008) ..............23

*Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004)..........18

*Bosley v. Chubb Corp.*, No. 04-cv-4598, 2005 WL 1334565 (E.D. Pa. June 3, 2005) .................17

*Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042 (N.D. Ill. 2003) ..........................................24

*Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941 (W.D. Ark. 2003) ...........................17, 32

*Gipson v. Sw. Bell Tel. Co.*, No. 08-cv-2017, 2009 WL 1044941 (D. Kan. Apr. 20, 2009) .........24

*Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862 (S.D. Ohio 2005)......................................24

*Hoffman La-Roche, Inc. v. Sperling*, 495 U.S. 165 (1989)............................................................17

*Levy v. Verizon Info. Servs., Inc.*, No. 06-cv-1583, 2007 WL 1747104
(E.D. N.Y. June 11, 2007) .......................................................................................................24, 25

*Lusardi v. Xerox Corp.*, 122 F.R.D. 463 (D. N.J. 1988)................................................................32

*Pfohl v. Farmers Ins. Group*, No. CV 03-3080 DT (RCX), 2004 WL 554834
(C.D. Cal. Mar. 1, 2004) ...............................................................................................................34

*Ray v. Motel 6 Operating Ltd. P'ship*, No. 3-95-828, 1996 WL 938231
(D. Minn. Mar. 18, 1996).........................................................................................................18, 32

*Robinson v. Dolgencorp, Inc.*, No. 5:06-cv-122-OC-10GRJ, 2006 WL 3360944
(M.D. Fla. Nov. 13, 2006) .............................................................................................................33

*Salazar v. Agriprocessors, Inc.*, No. 07-CV-1006-LRR, 2008 WL 782803
(N.D. Iowa Mar. 17, 2008) ............................................................................................................18

*Saleen v. Waste Mgmt., Inc.*, No. 08-4959, 2009 WL 1664451
(D. Minn. June 15, 2009) ............................................................................................17, 18, 21, 32

*Sharpe v. APAC Customer Servs., Inc.*, No. 09-cv-329, 2010 WL 135168
(W.D. Wis. Jan. 11, 2010) .............................................................................................................24

*Thompson v. Speedway SuperAmerica LLC*, No. 08-cv-1107, 2009 WL 130069
(D. Minn. Jan. 20, 2009).............................................................................................17, 21, 23, 33

*Tussing v. Quality Res., Inc.*, No. 8:09-cv-1833, 2009 WL 4350253
(M.D. Fla. Nov. 25, 2009) ..............................................................................................................23

12306024v.1

*Wacker v. Pers. Touch Home Care, Inc.*, No. 4:08CV93, 2008 WL 4838146
(E.D. Mo. Nov. 6, 2008) ............................................................................17, 18, 19, 25

*West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527
(D. Minn. July 10, 2006)............................................................................17, 18, 20, 23

*Williams v. Accredited Home Lenders, Inc.*, No. 05-cv-1681, 2006 WL 2085312
(N.D. Ga. July 25, 2006)...........................................................................................18

## STATUTES

29 U.S.C. § 216.............................................................................................................1

12306024v.1

Defendant GC Services Limited Partnership ("GC Services") submits this memorandum of law in opposition to Plaintiffs' Motion for Conditional Collective Action Certification and Notice pursuant to the Fair Labor Standards Act ("FLSA").

## I.    INTRODUCTION

Plaintiffs Erika Beasley and Lora Meyers, a former and current account representative of GC Services, respectively, claim that they performed work before and after their shifts, as well as during meal breaks, without receiving compensation for this additional work.  Further, they claim that account representatives who have worked at any of GC Services' 35 call centers located outside of California during the last three years also worked off the clock.  Accordingly, Plaintiffs seek conditional certification and authorization to send notice of the lawsuit to more than 52,000 people across the country.  Plaintiffs have not met their burden under Section 216(b) of the FLSA for such a sweeping request.

To support their motion, Plaintiffs submitted 25 declarations from employees who claim that they were not paid for performing a variety of tasks.  None of these declarants, however, explains *why* he or she was not paid for this alleged time.  Not only do these declarations fail to explain why the declarants worked off the clock, but they shed no light on the timekeeping and pay practices of the proposed class.

By contrast, 185 declarations from putative class members who did *not* work off the clock demonstrate that the nationwide extrapolation Plaintiffs seek is unwarranted.[1]  Moreover, account representatives, among other things, have different job duties, are subject to different performance metrics, and track their time in different ways.  And statistical data from GC

---

[1] For the Court's convenience and for ease of reference, GC Services has prepared an Index of Exhibits, which is attached as Exhibit A.  The Index lists the declarants by category and in alphabetical order.

12306024v.1

Services' timekeeping, computer work application, and badge entry systems demonstrates that even the named and opt-in plaintiffs are not similarly situated.  Accordingly, Plaintiffs' motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    GC Services' Business Operations.

GC Services is one of the largest privately-held outsourcing providers of call center management and collection agency services in North America.  It contracts with a broad range of clients, from Fortune 100 companies to federal, state, and municipal governments, to provide an equally broad range of services.  Those services range from general operator assistance, directory assistance, customer care, debt collection, to fraud monitoring.[2]

GC Services is headquartered in Houston, Texas, and currently operates 29 call centers across the United States.  Those calls centers are located in Mesa, Arizona; Phoenix, Arizona; Tucson, Arizona; Jacksonville, Florida; Lakeland, Florida; Atlanta, Georgia; Elgin, Illinois; Lansing, Michigan; St. Louis, Missouri; Weldon Spring, Missouri; Columbus, Ohio; Oklahoma City, Oklahoma (two separate call centers); Knoxville, Tennessee (two separate call centers); Copperas Cove, Texas (two separate call centers); El Paso, Texas (seven separate call centers); Houston, Texas; Killeen, Texas; San Antonio, Texas; and Huntington, West Virginia (two separate call centers).[3]  During the relevant time period, GC Services also operated additional call centers in Little Rock, Arkansas; Jacksonville, Florida; Boston, Massachusetts; St. Louis, Missouri; Cleveland, Ohio; and Dallas, Texas.[4]

---

[2] K. Jackson Decl. ¶ 3.

[3] *Id.* ¶ 4.  GC Services also has call centers in Irwindale, California, and San Diego, California. *Id.* ¶ 5.  These call centers, however, are not included in Plaintiffs' proposed class.

[4] *Id.* ¶ 6.

Since 2007, approximately 52,417 account representatives have worked for GC Services at these 35 (current and former) call centers, and they have been classified as non-exempt throughout the relevant time period.[5]

**B.      GC Services' Timekeeping Polices Prohibited Unpaid Work.**

**1.      GC Services' policies and training.**

GC Services instructs its account representatives that they are required to record all hours worked, and that they are prohibited from performing any work "off the clock."  GC Services disseminates these policies through its new hire packet, employee orientation, and training.

The new hire packet given to account representatives contains a "Time Card Accuracy Policy" that states:

> Each GC Services' employee is responsible for the accuracy of his/her hours to be paid for each payroll period, as detailed on the employee's time card.
>
> Prior to signing time cards for the current pay period, each employee should review the total hours to be paid.  Any discrepancy should be brought to the attention of the respective Manager or Supervisor for resolution.[6]

Moreover, during employee orientation and training, account representatives are instructed to clock in for payroll purposes *before* logging in to any work programs or systems and *before* performing any of their job duties.[7]  These employees are also told that they are prohibited from performing any work "off the clock," including before and after their scheduled

---

[5] *Id.* ¶ 7; *see, e.g.,* V. Adkins Decl. ¶ 4; K. Allen Decl. ¶ 4; R. Ball Decl. ¶ 4.

[6] *See, e.g.,* V. Adkins Decl. ¶ 3; K. Allen Decl. ¶ 3; R. Ball Decl. ¶ 3; M. Colegrove Decl. ¶ 3.

[7] *See, e.g.,* T. Wright Decl. ¶ 4; E. Moreno Decl. ¶ 3; T. Darnell Decl. ¶ 3; A. Ceasar Decl. ¶ 3; K. Tricamo Decl. ¶ 3; T. Noel Decl. ¶ 3; T. Runner Decl. ¶ 3; L. Sanchez Decl. ¶ 3; Z. Tirado Decl. ¶ 3; C. Rodriguez Decl. ¶ 3; C. Chervenak Decl. ¶ 5; N. Lynch Decl. ¶ 3; S. White Decl. ¶ 4; K. Kirkland Decl. ¶ 3; S. Peltier Decl. ¶ 3.

shift and during breaks.[8]  Indeed, numerous account representatives have confirmed that they were instructed to clock in to the timekeeping system before performing any work and before loading any systems that they need to perform their job, and to clock out only after they have completed all of their work.[9]  Not only have these account representatives confirmed that they were aware of the policies, they have confirmed that they followed them.  That is, none worked "off the clock."[10]

## 2.   Enforcement of policies.

GC Services enforces its timekeeping policies to ensure that account representatives are paid for all time worked, including overtime, in several ways.

First, if an account representative ever has a problem clocking in or out of the timekeeping system (e.g., computer delay), the employee's time entry will be adjusted to accurately reflect when the employee started working (or tried to start working).[11]  Second, GC Services requires account representatives to review and verify the accuracy of their work hours on a weekly or bi-weekly basis,[12] and some even do so on a daily basis.[13]  Third, account

---

[8] *See, e.g.,* R. Dennis Decl. ¶ 14 ("GC Services managers make it clear that working 'off the clock' is not permitted or allowed"); R. Nedd Decl. ¶ 12; L. Perryman Decl. ¶ 10; A. Amezcua Decl. ¶ 3; N. Ammerman Decl. ¶ 3.

[9] *See, e.g.,* S. Durbin Decl. ¶ 11; M. Burris Decl. ¶ 3; M. Costello Decl. ¶ 2; J. Sermans Decl. ¶ 2; M. Parris Decl. ¶ 2; S. Benoit Decl. ¶ 2; T. Beasley Decl. ¶ 2; D. McKinney Decl. ¶ 5; R. Nostrand Decl. ¶ 3; R. Houston Decl. ¶ 3; N. Johnson Decl. ¶ 3; R. Adams Decl. ¶ 3.

[10] *See, e.g.,* M. Kattleman Decl. ¶ 2 ("[d]uring my thirteen-year employment with GC Services, I have never performed any work 'off the clock'"); J. Amerio Decl. ¶ 11; K. Lord Decl. ¶ 12; M. Dupre Decl. ¶ 11; A. Booker Decl. ¶ 11; D. Lewis Decl. ¶ 11; R. Wylie Decl. ¶ 13; I. Bautista Decl. ¶ 11; J. Hughes Decl. ¶ 11.

[11] *See, e.g.,* S. Durbin Decl. ¶ 5; N. Padberg Decl. ¶ 5; J. Cedeno Decl. ¶ 5; C. Whitman Decl. ¶ 5; S. Scott Decl. ¶ 5; G. Carlton Decl. ¶ 5; E. Majalca Decl. ¶ 5; J. Williams Decl. ¶ 5; R. Robinson Decl. ¶ 6; D. Johnson Decl. ¶ 5; S. Contreraz Decl. ¶ 5; T. Johnson Decl. ¶ 5.

[12] *See, e.g.,* S. Doerneman Decl. ¶ 11; E. Bloomer Decl. ¶ 10; J. Dove Decl. ¶ 9; B. Ballard Decl. ¶ 11; K. Mayfield Decl. ¶ 11; J. Ortega Decl. ¶ 11; L. Knighten Decl. ¶ 10; C. Carter Decl. ¶ 10; N. Ammerman Decl. ¶ 10; E. Lyle Decl. ¶ 10; B. Kibler Decl. ¶ 12.

4

representatives record and are paid overtime, regardless of whether they are scheduled to work it.[14]   Fourth, account representatives are instructed to leave their desk and the work area when they are off the clock.[15]   So, for example, account representatives are not allowed to eat at their desk or even read magazines at their desk while they are off the clock.[16]   Fifth, account representatives are prohibited from answering calls after they have clocked out, whether for break or at the end of their shift.[17]   If they want to answer the call, they first have to clock back in.[18]   Sixth, managers will confirm that account representatives are on the clock while working or before asking them to do work.[19]   Finally, account representatives are not asked to work off of the clock.[20]

---

[13]  *See, e.g.,* C. Whitman Decl. ¶ 12; R. Cruz Decl. ¶ 10; J. Furman Decl. ¶ 9.

[14]  *See, e.g.,* S. Durbin Decl. ¶ 14 ("I often end up with just over forty hours each week due to calls that extend after my scheduled shift.  No one has ever complained about that overtime (even though it's not scheduled), and I have always been paid time and one-half my rate of pay for that overtime."); A. Ceasar Decl. ¶ 12; N. Benton Decl. ¶ 12; S. Bloomer Decl. ¶ 12.

[15]  *See, e.g.,* J. Ortega Decl. ¶ 6 ("Managers at this call center are very strict about this policy – Account Representatives are not allowed to be at their desk if they are off the clock."); A. Amezcua Decl. ¶ 6; E. Mora Decl. ¶ 6; T. Couch Decl. ¶ 5; A. Ceasar Decl. ¶ 7;  J. Furman Decl. ¶ 5; W. Delfino-Hebner Decl. ¶ 5; J. Williams Decl. ¶ 6; A. Hill Decl. ¶ 6; A. Michalet Decl. ¶ 6.

[16]  *See, e.g.,* J. Amerio Decl. ¶ 6 ("[O]ne time I came back from break early and quietly flipped through a magazine at my desk, and my manager told me that I am not allowed to be on the floor if I am off the clock."); E. Mora Decl. ¶ 6; K. Chervenak Decl. ¶ 3; N. Padberg Decl. ¶ 6; A. Klinker Decl. ¶ 6; R. Cruz Decl. ¶ 6; W. Delfino-Hebner Decl. ¶ 5; M. Dupre Decl. ¶ 6.

[17]  *See, e.g.,* T. Runner Decl. ¶ 6; K. Mayfield Decl. ¶ 6; A. Hill Decl. ¶ 11.

[18]  *See, e.g.,* T. Runner Decl. ¶ 6; K. Mayfield Decl. ¶ 6.

[19]  *See, e.g.,* B. Kibler Decl. ¶ 2 ("[I]t has been my experience that a manager will typically ask me if I am 'on the clock' before even asking me a work-related question or to perform a work-related task."); C. Alexander Decl. ¶ 7;

[20]  *See, e.g.,* S. Durbin Decl. ¶ 14; R. Berry Decl. ¶ 15; N. Harris Decl. ¶ 12; R. Nedd Decl. ¶ 11; J. Hughes Decl. ¶ 11; T. Noel Decl. ¶ 11; C. Williams Decl. ¶ 11; K. Bailey Decl. ¶ 11; J. Morgan Decl. ¶ 11; T. Rogers Decl. ¶ 11; R. Cruz Decl. ¶ 11; N. Lynch Decl. ¶ 11; M. Morales Decl. ¶ 11; A. Billburg Decl. ¶ 11; T. Couch Decl. ¶ 10.

**C.     Account Representatives Use An Electronic Timekeeping System To Record Their Hours Worked.**

GC Services does not pay account representatives based on the amount of time spent logged in to the telephone or work systems.  Nor does GC Services pay them based on their pre-established schedules or shifts.  Instead, account representatives use various electronic timekeeping systems to record their hours worked for payroll purposes.

**1.     Different call centers use different timekeeping systems.**

The timekeeping systems used by account representatives vary by call center.  Some call centers use a desktop system called PeopleSoft.[21]  Others use a desktop system called Star.[22]  Still others use a wall clock and/or desktop system know as Kronos.[23]  Moreover, some call centers have used different systems during the relevant time period.  For example, some call centers have used Star and PeopleSoft,[24] others have used Kronos and PeopleSoft,[25] and others have used a combination of Kronos wall clocks and desktops.[26]  Other call centers, however, have used the same system for the entire time period.[27]

---

[21] *See, e.g.,* C. Alexander Decl. ¶ 3; D. McKinney Decl. ¶ 5; J. Sermans Decl. ¶ 2; G. Rojo Decl. ¶ 2; T. Couch Decl. ¶ 2; T. Runner Decl. ¶ 2; W. Delfino-Hebner Decl. ¶ 2; J. Buckley Decl. ¶ 2.

[22] *See, e.g.,* N. Johnson Decl. ¶ 2; T. Davis Decl. ¶ 2; L. Johnson Decl. ¶ 3; K. Smith Decl. ¶ 2; R. Houston Decl. ¶ 2; S. Vanderpool Decl. ¶ 2; N. Harris Decl. ¶ 2.

[23] *See, e.g.,* A. Sprouse Decl. ¶ 2; A. Guzman Decl. ¶ 2; E. Murphy Decl. ¶ 2; D. Glass Decl. ¶ 2; W. Gimblet Decl. ¶ 2; K. Tricamo Decl. ¶ 2; A. Welch Decl. ¶ 2; B. Lewenczuk Decl. ¶ 2.

[24] *See, e.g.,* T. Wright Decl. ¶ 3; T. Mitchell Decl. ¶ 2; M. Waweru Decl. ¶ 2; D. Escobedo Decl. ¶ 2; D. Robinson Decl. ¶ 5.

[25] *See, e.g.,* E. Grajales Decl. ¶ 2; T. Darnell Decl. ¶ 2; J. Furman Decl. ¶ 2.

[26] *See, e.g.,* S. Callicott Decl. ¶ 2; D. Evans Decl. ¶¶ 2, 3; D. Johnson Decl. ¶ 2; A. Johnson Decl. ¶ 2; K. Robinson Decl. ¶ 2; L. Knighten Decl. ¶ 2; S. Clark Decl. ¶ 2; R. Robinson Decl. ¶¶ 2, 3.

[27] *See, e.g.,* L. Saez Decl. ¶ 2; Z. Tirado Decl. ¶ 2; J. Hughes Decl. ¶ 2; D. Adkins Decl. ¶ 2; T. Davis Decl. ¶ 2;  L. Johnson Decl. ¶¶ 1, 3; R. Houston Decl. ¶¶ 1, 2; S. Vanderpool Decl. ¶¶ 1, 2.

### 2.    The timekeeping practices of account representatives vary.

Even when using the same timekeeping system, there are still differences in the way account representatives clock in and out.  Employees at the two call centers in Huntington, West Virginia, for example, clock in and out through Star.  Account representatives at the East Huntington center can clock in and out through their own or another employee's computer,[28] while account representatives at the West Huntington center can only clock in and out through a supervisor kiosk.[29]

Moreover, timekeeping practices differ even within individual call centers.  At the Weldon Spring, Missouri call center, for example, some employees can clock in and out of Kronos through one of the wall clocks in the center or through their own or any other employee's computer.[30]  Yet others at the Weldon Spring center can only clock in and out through a computer, and not a wall clock.[31]

### 3.    When account representatives are allowed to clock in to the timekeeping system varies.

When account representatives are permitted to clock in to the timekeeping system varies by call center and within call centers.  Some account representatives, for example, are allowed to clock in ten to fifteen minutes before their scheduled shift.[32]  Other account representatives are

---

[28] *See, e.g.,* J. Hughes Decl. ¶ 2; N. Johnson Decl. ¶ 2; L. Johnson Decl. ¶5; R. Houston Decl. ¶ 2; S. Vanderpool Decl. ¶ 2; D. Adkins Decl. ¶ 2; T. Davis Decl. ¶ 2.

[29] *See, e.g.,* N. Harris Decl. ¶ 2; L. Johnson Decl. ¶ 3; K. Smith Decl. ¶ 2; R. Houston Decl. ¶ 2; S. Vanderpool Decl. ¶ 2; V. Adkins Decl. ¶ 5.

[30] *See, e.g.,* K. Tricamo Decl. ¶ 2; R. Wylie Decl. ¶ 3; B. Lewenczuk Decl. ¶¶ 2, 3; D. Evans Decl. ¶¶ 2, 3; S. Callicott Decl. ¶ 2; D. Johnson Decl. ¶ 2; K. Robinson Decl. ¶ 2; L. Knighten Decl. ¶ 2; S. Clark Decl. ¶ 2.

[31] *See, e.g.,* N. Moore Decl. ¶ 3; M. Cables Decl. ¶ 2; S. Callicott Decl. ¶ 2; D. Johnson Decl. ¶ 2; K. Robinson Decl. ¶ 2; L. Knighten Decl. ¶ 2; S. Clark Decl. ¶ 2.

[32] *See, e.g.,* B. Ballard Decl. ¶ 5 ("I usually arrive approximately fifteen minutes before my scheduled start time. I am permitted to immediately clock in through PeopleSoft and begin my

7

not allowed to clock in until seven minutes before their shift starts.[33]  Others are not allowed to clock in until five minutes before their shift starts.[34]  Some are not allowed to clock in until two[35] or three[36] minutes before their shift starts.  Still others are not allowed to clock in until the moment their shift starts or one minute before.[37]

### 4. How long it takes account representatives to clock in varies.

The time it takes account representatives to clock in also varies.  Some account representatives, for example, clock in through wall clocks and, thus, are clocked in instantaneously (to clock in or out, they just swipe their employee badge through the wall clock).[38]  Others clock in through their own computer and estimate the entire process takes between ten seconds,[39] thirty seconds or less,[40] one minute or less,[41] to two minutes.[42]  Some clock in through other employees' computers, which is even faster since the system is already

---

work."); L. Perryman Decl. ¶ 5 ("I am usually on the clock and taking calls approximately 10 minutes before my scheduled start time.").

[33] *See, e.g.,* R. Wylie Decl. ¶ 9; L. Knighten Decl. ¶ 7.

[34] *See, e.g.,* R. Dennis Decl. ¶ 7; J. Furman Decl. ¶ 6; C. Whitman Decl. ¶ 8; N. Moore Decl. ¶ 10.

[35] *See, e.g.,* M. Morales Decl. ¶ 7; S. Neal Decl. ¶ 7; A. Ceasar Decl. ¶ 6; I. Bautista Decl. ¶ 7.

[36] *See, e.g.,* T. Mendez Decl. ¶ 7.

[37] *See, e.g.,* K. Withey Decl. ¶ 7; K. Smith Decl. ¶ 6.

[38] *See, e.g.,* D. Perez Decl. ¶ 4; W. Gimblet Decl. ¶ 4; D. Glass Decl. ¶ 4; S. Paul Decl. ¶ 4; A. Guzman Decl. ¶ 4.

[39] *See, e.g.,* L. Perryman Decl. ¶ 4 (couple of seconds); M. Rodriguez Decl. ¶ 4 (same); R. Adams Decl. ¶ 4 (10 seconds); N. Benton Decl. ¶ 5 (same); A. Brais Decl. ¶ 4 (same).

[40] *See, e.g.,* M. Cherry Decl. ¶ 3 (20 seconds); S. Griffin Decl. ¶ 3 (same); E. Lyle Decl. ¶ 4 (30 seconds or less); E. Murphy Decl. ¶ 4 (same); D. Lewis Decl. ¶ 4 (30 seconds).

[41] *See, e.g.,* M. Burris Decl. ¶ 4 (35-50 seconds); M. Parris Decl. ¶ 3 (less than 1 minute); N. Ammerman Decl. ¶ 4 (1 minute or less); D. McKinney Decl. ¶ 6 (1 minute).

[42] *See, e.g.,* E. Majalca Decl. ¶ 4 (1 to 2 minutes); A. Hill Decl. ¶ 4 (2 minutes or less); E. Bloomer Decl. ¶ 4 (2 minutes).

8

loaded.[43]   And still others vary their practices, so they will clock in through a wall clock or someone else's computer one day, and then clock in through their own computer the next day.[44]

### D.   The Log-in Grace Periods Available To Account Representatives, If Any, Vary.

Whether account representatives are considered tardy and get an "occurrence" is based on when they clock in to the timekeeping system, not the work or phone systems.[45]   Some Account Representatives are given a grace period to clock in to the timekeeping system before they are considered tardy;[46] others are not.[47]   And whether they receive a grace period, and the length of that period, varies by call center and within call centers.

For example, at the St. Louis call center, account representatives are given a five-minute grace period to clock in before they are considered tardy.[48]   A few miles away at the Weldon Spring call center, however, some account representatives are given a six-minute grace period;[49]

---

[43] *See, e.g.,* N. Johnson Decl. ¶ 4; J. Furman Decl. ¶ 4; J. Amerio Decl. ¶ 5; K. Lord Decl. ¶ 5; T. Davis Decl. ¶ ; C. Whitman Decl. ¶ 5; M. Dupre Decl. ¶ 5; A. Billburg Decl. ¶ 5.

[44] *See, e.g.,* A. Sprouse Decl. ¶ 4; A. Booker Decl. ¶ 4; T. Ormsbee Decl. ¶ 4; C. Rodriguez Decl. ¶ 4; L. Sanchez Decl. ¶ 4; J. Alvarez Decl. ¶ 4.

[45] *See, e.g.,* S. Durbin Decl. ¶ 8; J. Taylor Decl. ¶ 11; R. Dennis Decl. ¶ 8; R. Berry Decl. ¶ 10; J. Rodgers Decl. ¶ 9.

[46] *See, e.g.,* N. Harris Decl. ¶ 7 (7 minute grace period); T. Wright Decl. ¶ 10 (same); J. Bonsignore Decl. ¶ 8 (same); T. Beasley Decl. ¶ 3 (same); R. Wylie Decl. ¶ 8 (same); A. Hill Decl. ¶ 7 (same); D. Johnson Decl. ¶ 7 (6 minute grace period); J. Taylor Decl. ¶ 11 (5 minute grace period).

[47] *See, e.g.,* D. Gonzalez Decl. ¶ 6; G. Waite Decl. ¶ 8; D. Doerneman Decl. ¶ 8; S. Neal Decl. ¶ 7.

[48] *See, e.g.,* S. Durbin Decl. ¶ 8; A. Wallace Decl. ¶ 9; R. Berry Decl. ¶ 10; J. Rodgers Decl. ¶ 9; K. Kirkland Decl. ¶ 8; J. Thompson Decl. ¶ 10; J. Buckley Decl. ¶ 7; D. Robinson Decl. ¶ 11; T. Johnson Decl. ¶ 7; E. Newbanks Decl. ¶ 6.

[49] *See, e.g.,* D. Johnson Decl. ¶ 7.

some are given a seven-minute grace period;[50] others are not aware of having a grace period at all.[51]  And these differences exist beyond GC Services' Missouri call centers.[52]

More importantly, these grace periods affect when account representatives arrive at the call centers, and those variations directly impact Plaintiffs' allegation that employees had to arrive at least ten minutes early to avoid being considered tardy.  Many account representatives, for example, take advantage of the grace period and regularly arrive at their respective center right at the start of their scheduled shift or even a few minutes after it.[53]  Yet, if they clock in to the timekeeping system within the grace period, they are considered on time and do not get an occurrence.[54]

### E.    Account Representatives Have Different Work Schedules.

The work schedules or shifts assigned to account representatives vary by call center and within call centers.  Some account representatives, for example, are assigned an 8.5- or 9-hour shift that includes a 30 or 60 minute *unpaid* meal break, respectively, and two 15 minute paid

---

[50] *See, e.g.,* R. Wylie Decl. ¶ 8; K. Tricamo Decl. ¶ 7; K. Robinson Decl. ¶ 6; B. Lewenczuk Decl. ¶ 7; A. Johnson Decl. ¶ 7; N. Moore Decl. ¶ 9; R. Robinson Decl. ¶ 7; A. Welch Decl. ¶ 6; S. White Decl. ¶ 8; S. Clark Decl. ¶ 7; S. Callicott Decl. ¶ 6; D. Evans Decl. ¶ 7; M. Cables Decl. ¶ 7.

[51] *See, e.g.,* L. Knighten Decl. ¶ 7.

[52] *Compare, e.g.,* C. Alexander Decl. ¶ 11 (no grace period at Chicago NSC call center), *with, e.g.,* T. Wright Decl. ¶ 10 (7 minute grace period at Chicago NSC call center), *with, e.g.,* P. Mann Decl. ¶ 9 (grace period of a "few minutes" at Chicago NSC call center).

[53] *See, e.g.,* N. Moore Decl. ¶ 9 ("I have clocked in to Kronos up to six or seven minutes after my scheduled start time, but I was still considered 'on time' because I was within the seven minute grace period."); K. Robinson Decl. ¶ 6; A. Klinker Decl. ¶ 7; D. Escobedo Decl. ¶ 7; K. Tricamo Decl. ¶ 7; S. White Decl. ¶ 8; D. Evans Decl. ¶ 7; R. Berry Decl. ¶ 10; A. Wallace Decl. ¶ 9.

[54] *See, e.g.,* N. Moore Decl. ¶ 9; A. Klinker Decl. ¶ 7; D. Escobedo Decl. ¶ 7; K. Tricamo Decl. ¶ 7; S. White Decl. ¶ 8; D. Evans Decl. ¶ 7; R. Berry Decl. ¶ 10; A. Wallace Decl. ¶ 9;

rest breaks.[55]   Other account representatives are assigned 8-hour shifts that include a 30 minute

*paid* meal break and additional paid rest breaks.[56]   And others are assigned 8-hour shifts that

include 40 minutes worth of *paid* break time that the employee can split up.[57]   These variations

directly impact Plaintiffs' allegations of off-the-clock work during meal breaks (i.e., if the meal

break was on the clock, then an employee could not have worked off the clock during that time).

> ### F.     When Account Representatives Are Allowed To Enter The Call Center, Go To Their Work Area Or Desk, And Start Working Varies.

When account representatives are allowed to access the call center itself varies by call

center and within call centers.   For example, some account representatives can arrive at their

respective call centers thirty minutes before their shift starts.[58]   Yet others cannot enter the

facility until 14-15 minutes before their scheduled start time.[59]

Similarly, when account representatives are allowed "on the floor" (i.e., the work area

where their desks and computers are located) varies by call center and within call centers.   Some

account representatives are not allowed on the floor until one minute before their shift starts.[60]

Some are not allowed on the floor until three minutes before their shift starts.[61]   Others are not

---

[55] *See, e.g.,* M. Dupre Decl. ¶ 6; A. Billburg Decl. ¶ 6; E. Grajales Decl. ¶ 6; I. Bautista Decl. ¶¶ 6, 7; N. Padberg Decl. ¶¶ 6, 7; T. Mendez Decl. ¶ 6; S. Wilkes Decl. ¶ 6; L. Farmer Decl. ¶ 6.

[56] *See, e.g.,* N. Moore Decl. ¶ 7; R. Robinson Decl. ¶ 7; M. Cables Decl. ¶ 6; D. Evans Decl. ¶ 6; A. Welch Decl. ¶ 5.

[57] *See, e.g.,* V. Inman Decl. ¶ 7; L. Sanchez Decl. ¶ 6; D. Perez Decl. ¶ 6; J. Bonsignore Decl. ¶ 7; R. Adams Decl. ¶ 7; J. Alvarez Decl. ¶ 6; V. Fields Decl. ¶ 6; S. Foster Decl. ¶ 6; A. Guzman Decl. ¶ 6; D. Lewis Decl. ¶ 6.

[58] *See, e.g.,* N. Harris Decl. ¶ 5; J. Hughes Decl. ¶ 7; D. Adkins Decl. ¶ 3.

[59] *See, e.g.,* B. Bloomer Decl. ¶ 3 ("The security system will not allow an employee to enter the facility until fifteen (15) minutes before the first scheduled shift for the client team that the employee is on."); C. Whitman Decl. ¶ 7 (not able to get in to the building until 14 minutes before scheduled start time).

[60] *See, e.g.,* E. Moreno Decl. ¶ 7.

[61] *See, e.g.,* J. Sermans Decl. ¶ 5; M. Parris Decl. ¶ 5; S. Benoit Decl. ¶ 5; J. Amerio Decl. ¶ 7.

allowed on the floor until five minutes before their shift starts.[62]  Still others are not allowed on the floor until seven minutes before their shift starts.[63]  Finally, some are not aware of any restrictions regarding when they can go on the floor before their shift starts.[64]

Even when account representatives are allowed to start working in relation to when they clock in to the timekeeping system varies.  Some account representatives, for example, are allowed to start working immediately after they clock in.[65]  Others, however, are not allowed to start working until their actual start time—even though they are permitted to clock in before their shift starts.[66]

These variations are important because when account representatives can enter the call center, go to their work areas, and start loading their systems and handling calls directly impacts whether they could perform off-the-clock work before the start of their shift.

### G.   Account Representatives Have Different Job Duties And Use Different Work Systems.

The job duties of account representatives differ substantially, and these differences exist even within call centers.[67]  For example, within the Mesa, Arizona call center, some account representatives perform their job duties through internet chat rooms instead of by phone,[68] some

---

[62] *See, e.g.,* M. Costello Decl. ¶ 5; I. Bautista Decl. ¶ 7; K. Lord Decl. ¶ 7; K. Withey Decl. ¶ 7.

[63] *See, e.g.,* R. Adams Decl. ¶ 6; J. Bonsignore Decl. ¶ 6; V. Inman Decl. ¶ 6; B. Richardson Decl. ¶ 6.

[64] *See, e.g.,* N. Harris Decl. ¶ 5; D. Adkins Decl. ¶ 3; K. Smith Decl. ¶ 4.

[65] *See, e.g.,* S. Durbin Decl. ¶ 3; J. Taylor Decl. ¶ 6; R. Dennis Decl. ¶ 3; R. Berry Decl. ¶ 5; J. Rodgers Decl. ¶ 4.

[66] *See, e.g.,* R. Wylie Decl. ¶ 9.

[67] *Compare, e.g.,* R. Wylie Decl. ¶ 1 (does not handle any customer or client telephone calls), *and, e.g.,* B. Lewenczuk Decl. ¶ 8 ("I do not take calls"), *with, e.g.,* R. Robinson Decl. ¶ 9 (supposed to be available to handle telephone calls for 90% of her workday).

[68] *See, e.g.,* T. Couch Decl. ¶ 1; T. Darnell Decl. ¶ 1; N. Padberg Decl. ¶ 1; J. Furman Decl. ¶ 1.

field inbound calls and provide customer support,[69] and others make outbound calls and perform collections work.[70]   Likewise, in Huntington, West Virginia, some handle calls[71] while others only skip trace.[72]

Because account representatives' job duties vary, so do the work systems they use.  For example, some account representatives use a single system, such as Star,[73] Aspect,[74] or Avaya,[75] to perform their job duties.  Yet others use as many as 12 different client-based systems or programs to perform their duties.[76]  Some are assigned an e-mail account to perform their job;[77] others are not.[78]

The variations in the account representatives' job duties and the number and type of work systems they use directly impact Plaintiffs' allegations that they had to arrive early to load various programs and review e-mail before their shift.

---

[69] *See, e.g.,* S. Doerneman Decl. ¶ 1; K. Lord Decl. ¶ 1; A. Michalet Decl. ¶ 1; S. Neal Decl. ¶ 1.

[70] *See, e.g.,* A. Billburg Decl. ¶ 1; G. Rojo Decl. ¶ 1; K. Withey Decl. ¶ 1.

[71] *See, e.g.,* S. Vanderpool Decl. ¶ 1; V. Adkins Decl. ¶ 2; A. Smith Decl. ¶ 2; E. McKee Decl. ¶ 2.

[72] *See, e.g.,*  L. Johnson Decl. ¶ 2; R. Houston Decl. ¶ 1.

[73] *See, e.g.,* S. Durbin Decl. ¶ 3; J. Taylor Decl. ¶ 6; L. Hummrich Decl. ¶ 4; S. Contreraz Decl. ¶ 4; N. Ammerman Decl. ¶ 3; N. Benton Decl. ¶ 4; R. Berry Decl. ¶ 5.

[74] *See, e.g.,* A. Booker Decl. ¶ 3; L. Knighten Decl. ¶ 3; D. Lewis Decl. ¶ 3; T. Ormsbee Decl. ¶ 3; E. Murphy Decl. ¶ 3; N. Moore Decl. ¶ 4; B. Richardson Decl. ¶ 3.

[75] *See, e.g.,* V. Fields Decl. ¶ 3; W. Gimblet Decl. ¶ 3; D. Glass Decl. ¶ 3; A. Guzman Decl. ¶ 3; E. Lyle Decl. ¶ 3; J. McRae Decl. ¶ 3.

[76] *See, e.g.,* E. Blomer Decl. ¶ 3; J. Dove Decl. ¶ 3; K. Lord Decl. ¶ 3; C. Whitman Decl. ¶ 3.

[77] *See, e.g.,* R. Wylie Decl. ¶ 1 ("I have been assigned an e-mail account for my work at GC Services, and I receive and review e-mails to perform my job.").

[78] *See, e.g.,* J. Bonsignore Decl. ¶ 10; R. Dennis Decl. ¶ 10; S. Durbin Decl. ¶ 10; N. Harris Decl. ¶ 6; D. Lewis Decl. ¶ 8.

**H.     Account Representatives Are Subject To Different Job Expectations.**

The performance metrics for account representatives vary by call center and within call centers.  For example, some account representatives are expected to handle a minimum number of phone calls per hour or per day, and that number varies widely,[79] and some have daily "talk time" expectations.[80]  Other account representatives are expected to be available to handle calls for a certain percentage of the workday, which is referred to as a "utilization rate."  Utilization rates vary[81] and even two account representatives at the same call center may not have the same utilization rate.  For instance, in Weldon Spring, some account representatives have a 86.5% utilization rate while others have a 96% utilization rate.[82]

By contrast, many account representatives are not given a utilization rate at all and, thus, are not required to be on the phone, in the work systems, or available to handle calls for a certain percentage of the day.[83]  Nor are many expected to handle a minimum number of calls per hour or per day.[84]

These different performance metrics (or lack thereof) are important to the extent Plaintiffs suggest that they and other account representatives worked off the clock to hit certain metrics.  If those metrics resulted in some account representatives choosing to work without

---

[79] *See, e.g.,* L. Knighten Decl. ¶ 8 (5 calls per hour); C. Alexander Decl. ¶ 10 (175 calls per day); S. Contreraz Decl. ¶ 10 (same); T. Wright Decl. ¶ 9 (150 calls per day); K. Chervenak Decl. ¶ 8 (same); R. Berry Decl. ¶ 12 (same).

[80] *See, e.g.,* L. Perryman Decl. ¶ 11 (3 hours).

[81] *See, e.g.,* D. Johnson Decl. ¶ 8 (86.5%); A. Billburg Decl. ¶ 8 (89%); L. Knighten Decl. ¶ 8 (89.5%); V. Adkins Decl. ¶ 9 (90%); A. Johnson Decl. ¶ 8 (96%).

[82] *Compare, e.g.,* D. Johnson Decl. ¶ 8 (86.5%), *with, e.g.,* A. Johnson Decl. ¶ 8 (96%).

[83] *See, e.g.,* N. Benton Decl. ¶ 10; K. Lord Decl. ¶ 9; T. Wright Decl. ¶ 11;  R. Adams Decl. ¶ 9; V. Fields Decl. ¶ 8; C. Alexander Decl. ¶ 12; M. Daka Decl. ¶ 10; L. Brown Decl. ¶ 11.

[84] *See, e.g.,* J. Alvarez Decl. ¶ 8; T. Couch Decl. ¶ 7; J. McRae Decl. ¶ 8; T. Mendez Decl. ¶ 8.

14

being logged into the timekeeping system, such metrics did not exist for others and thus could not have caused them to work off the clock.

### I.     Account Representatives' Pay Varies.

Because of the differences in the work performed by account representatives, there is also a wide disparity in their compensation.  For example, some account representatives who perform collections work get 20% of any amount collected over their monthly budget.[85]  Those who perform skip tracing get bonuses when they locate a debtor.[86]  And those with a utilization expectation may get a bonus for hitting a certain rate.[87]

As a result of these differences, some account representatives may make $7.61 per hour,[88] while others make $96,000[89] or even $127,000[90] a year.

### J.     The Method GC Services Uses To Charge Clients For Work Performed By Account Representatives Varies.

The method used by GC Services to bill clients for account representatives' time varies by client and by the type work done for a client.  For example, at the Weldon Spring and Lakeland call centers, GC Services charges the client based on the time that account representatives are clocked in to the timekeeping system.[91]  By contrast, the account

---

[85]  *See, e.g.,* K. Mayfield Decl. ¶ 2; L. Brown Decl. ¶ 2; D. Gonzalez Decl. ¶ 2; L. Hummrich Decl. ¶ 2; P. Mann Decl. ¶ 2; C. Alexander Decl. ¶ 2; T. Wright Decl. ¶ 2.

[86]  *See, e.g.,* R. Houston Decl. ¶ 6; L. Johnson Decl. ¶ 8 (eligible for incentive pay if she is logged into the work systems for 90% of her scheduled time, works at least 11 accounts per hour, and has a find rate (accounts found divided by accounts worked) of 47.5%).

[87]  *See, e.g.,* E. Moreno Decl. ¶¶ 2, 8; A. Billburg Decl. ¶¶ 2, 8; G. Rojo Decl. ¶ 8.

[88]  *See, e.g.,* R. Wylie Decl. ¶ 2 ($7.61 hourly rate).

[89]  *See, e.g.,* R. Berry Decl. ¶ 2.

[90]  *See, e.g.,* J. Rodgers Decl. ¶ 2.

[91]  P. Paridy Decl. ¶ 2.

representatives at the St. Louis call center are billed out based on a percentage of their collections.[92]

How GC Services is paid for account representatives' time can even vary within call centers.  In Mesa, for example, there are currently four different client teams, which are broken down into ten different projects.[93]  For six of those projects, GC Services is paid based on the time that account representatives are clocked in to the timekeeping system.[94]  For two of the projects, GC Services is paid based on the time that account representatives are actually handling customer telephone calls.[95]  For another project, GC Services is paid based on the time that account representatives are logged in to the phone system and available to handle customer calls.[96]  And for the final project, GC Services is paid based on the amount of time that account representatives are logged in to the client-based work system.[97]

These variations are important to the extent Plaintiffs allege that GC Services has an incentive to permit account representatives to work off the clock.  To the contrary, when a client pays GC Services based on the time that account representatives are clocked in to the timekeeping system, GC Services has every incentive to ensure they are *on* the clock, not *off* it.

## III.    ARGUMENT

### A.    Conditional Certification Is Not Automatic.

Plaintiffs' recitation of the standard of review gives the erroneous impression that there is some sort of presumption in favor of conditional certification.  But "automatic preliminary class

---

[92] E. Bernhagen Decl. ¶ 7.

[93] P. Gazeley Decl. ¶ 2

[94] *Id.* ¶ 3.

[95] *Id.* ¶ 4.

[96] *Id.* ¶ 5.

[97] *Id.*

16

certification is at odds with the Supreme Court's recommendation to 'ascertain the contours of the action at the outset.'" *Bosley v. Chubb Corp.*, No. 04-cv-4598, 2005 WL 1334565, at *3-4 (E.D. Pa. June 3, 2005) (*quoting Hoffman La-Roche, Inc. v. Sperling*, 495 U.S. 165, 171-72 (1989)). "While the burden on the plaintiff is relatively low at this initial stage, it is not invisible." *Wacker v. Pers. Touch Home Care, Inc.*, No. 4:08CV93, 2008 WL 4838146, at *2 (E.D. Mo. Nov. 6, 2008) (Perry, J.). Indeed, even showing that "some employees were paid less than the FLSA required" is not enough to merit conditional certification. *Thompson v. Speedway SuperAmerica LLC*, No. 08-cv-1107, 2009 WL 130069, at *1 (D. Minn. Jan. 20, 2009).

To succeed in their motion, Plaintiffs must demonstrate that they and the putative class members are "similarly situated." *West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527, at *2 (D. Minn. July 10, 2006). As this Court has explained, plaintiffs seeking conditional certification "must establish a colorable basis for their claim that the class members were the victims of a single decision, policy, or plan." *Wacker,* 2008 WL 4838146, at *2. In addition, plaintiffs must demonstrate that the case is manageable as a collective action. *Saleen v. Waste Mgmt., Inc.*, No. 08-4959, 2009 WL 1664451, at *4 (D. Minn. June 15, 2009); *see also West*, 2006 WL 1892527, at *3 (D. Minn. July 10, 2006) (explaining that plaintiffs must show "that factual similarities or differences among the putative [p]laintiffs are such that the case may be properly managed as a collective action").

The evidence offered by plaintiffs to support their motion cannot be conclusory and must be based on personal knowledge, *West*, 2006 WL 1892527, at *6, and "unsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden," *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003). Although Plaintiffs suggest that the Court should look "solely" to their evidence at this initial stage (Pl. Mem. at 7), "neither the remedial

17

purposes of the FLSA, nor the interests of judicial economy, would be advanced if [courts] were to overlook facts which generally suggest that a collective action is improper." *West*, 2006 WL 1892527, at *7. Accordingly, courts consider all of the available evidence—including evidence submitted by the defendant—when determining whether to conditionally certify a case. *See, e.g., Saleen*, 2009 WL 1664451, at *8 (explaining that "it is incumbent on a court at the conditional-certification stage to review all the evidence before it to determine whether it should facilitate notice and thereby expand the scope of litigation"); *Wacker*, 2008 WL 4838146, at *4 (considering defendants' affidavits that refuted plaintiff's evidence of a company-wide policy).

Even when plaintiffs have met their burden, the decision to authorize notice of an FLSA action to putative class members remains soundly within the discretion of the Court. *Salazar v. Agriprocessors, Inc.*, No. 07-CV-1006-LRR, 2008 WL 782803, at *4 (N.D. Iowa Mar. 17, 2008). "To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for the same prior to certification would be an exercise in futility and wasted resources for all parties involved." *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004). Moreover, where, as here, a significant class size is at issue—Plaintiffs' proposed class includes more than 52,000 individuals—courts do not take this inquiry lightly by virtue of the significant burdens imposed on all of the parties by the scope of the requested relief. *See, e.g., Williams v. Accredited Home Lenders, Inc.*, No. 05-cv-1681, 2006 WL 2085312, at *4 n.4 (N.D. Ga. July 25, 2006) (noting that similarity requirement must be applied with "rigor" in large cases); *Ray v. Motel 6 Operating Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *5 (D. Minn. Mar. 18, 1996) ("The discrepancies between Plaintiffs' employment circumstances and the significant manageability

problems inherent in a trial of 1000 plus individuals demonstrate that it is inappropriate to pursue this case as a [FLSA] class action.").

### B. Plaintiffs' Cannot Establish That The Account Representatives In The Proposed Nationwide Collective Action Are Similarly Situated.

Plaintiffs allege that they and more than 52,000 other account representatives who worked at 35 call centers across the country were required to work off the clock before and after their scheduled shifts, and during their unpaid meal breaks. Specifically, Plaintiffs claim that they had to begin working at least 10 or 15 minutes before their scheduled shifts because they were required to log in to various software programs and applications, log in to the telephone system, and be ready to handle calls all by the start of their scheduled shifts or they were considered tardy. (Pls. Mem. at 3, 4.) Plaintiffs also allege that they were required to handle calls, complete reports, review memoranda, and perform other tasks during their unpaid meal breaks and after their shifts. (Pls. Mem. at 4.) These activities, according to Plaintiffs, were all done off the clock. (Pls. Mem. at 3-4.)

To support their motion, Plaintiffs offer declarations from 25 current and former employees of GC Services: 18 from Huntington, West Virginia; 3 from St. Louis; 2 from Copperas Cove, Texas; and 2 from San Diego and Irwindale, California. The two declarations from California employees, however, are irrelevant because Plaintiffs have specifically excluded employees who worked in California from their proposed class (and they recently amended their nationwide complaint to exclude California (Dkt. #40)). (Pls. Mem. at 2.) Moreover, these employees do not claim to have *any* personal knowledge of the operations at the 35 call centers actually at issue here, and many of their statements are merely conclusory. (*See, e.g.*, C. Conley Decl. ¶¶ 10, 14; M. Parotino Decl. ¶¶ 10, 14). The Court should not consider this testimony. *See Wacker*, 2008 WL 4838146, at *3-4 (requiring plaintiff to rely on competent evidence and

19

not a conclusory affidavit from a former manager who lacked personal knowledge of defendant's offices outside of Missouri); *West*, 2006 WL 1892527, at *6 (eliminating averments that were not based on personal knowledge or were conclusory).

Nonetheless, Plaintiffs still fail to explain the *reason* why they were not compensated for certain tasks, let alone identify a company-wide policy that violates the FLSA.  Moreover, as demonstrated by the declarations submitted by the parties, the experiences of the Plaintiffs and other putative class members are markedly different, and there are even differences between the named and opt-in plaintiffs themselves.  Accordingly, this action is not susceptible to collective action treatment.

### 1. Plaintiffs Have Not Identified A Single Decision, Policy, or Plan.

Plaintiffs have not pointed to a written policy requiring them to work without compensation, to log into their computer applications by the start of their shift, to be available to take calls at the beginning of their shift, or to perform any of their job duties after they have clocked out for their meal break or at the end of the day.  There is simply no such policy.  Nor do Plaintiffs even contend that they were directed or asked by management to work off the clock.

Instead, Plaintiffs only claim that they were not paid for a wide range of tasks.  Nothing more.  For example, 20 of the named and opt-in plaintiffs submitted declarations that state:

> To avoid being held as tardy or out of adherence with my scheduled shift, I regularly arrived at least ten minutes or more before the start of my shift to boot up and log-on to the computer, log-on to the software programs and applications, and log-on to the telephone before the beginning of my assigned shift.  I was not paid for that time.

> In addition, I also worked unpaid time after my scheduled shift or during lunch breaks, including refreshing my computer and/or logging back in to the software programs and applications so that I could perform my work duties during the afternoon portion of my shift.

20

Further, I also worked unpaid time after my scheduled shift performing various tasks such as finishing calls, completing reports, and reading correspondence from management.

(Plaintiffs' Exhibits 2-22, ¶¶ 5, 6, 7.)

But evidence that some employees were not compensated for work is insufficient to merit conditional certification. *Thompson*, 2009 WL 130069, at *2. Rather, Plaintiffs must offer evidence that "the *reason* why the employees were not compensated . . . is not because of human error or a rogue store manager, but because of a corporate decision to ignore [defendant's] published policies and refuse to pay for [certain tasks]." *Id.*; *see also Saleen*, 2009 WL 1664451, at *4-5 (denying motion for conditional certification where 112 employee declarations failed to show that the reason why employees worked off the clock was due to a single decision, policy, or plan). Plaintiffs declarations, however, do not offer *any* reason whatsoever for why they were allegedly not paid for this time. They do not, for example, explain the following:

- whether the individual was clocked in to the timekeeping system while he or she performed the tasks but was not compensated for that time (e.g., time sheets were altered to delete overtime hours worked);

- whether the timekeeping system would not let the individual clock in until his or her scheduled start time;

- whether the timekeeping system automatically clocked the individual out at his or her scheduled break and shift-end time, even if the individual was still working;

- whether the individual's manager directed him or her to perform the pre-shift tasks before clocking in to the timekeeping system;

- whether the individual's manager directed him or her to clock out during their break and at the end of their shift; or

- whether the individual reported his or her alleged off-the-clock activity to his or her manager or if the manager otherwise knew that the individual performed work for which he or she was not paid.

Remarkably, their declarations do not even describe how the employees were paid (e.g., based on their pre-established schedules, time logged in to the work or telephone systems, or the

21

time they recorded in a separate timekeeping system), what timekeeping system they used to record their time for payroll purposes (e.g., Kronos, Star, or PeopleSoft), how they recorded their time in that system (e.g., own computer, manager kiosk, or wall clock), or the work systems they had to load by the start of their shift (e.g., a single GC Services system or a combination of numerous client-based systems).

Similarly, the declarations submitted by the two opt-in plaintiffs who worked as managers or trainers are conclusory and fail to explain *why* account representatives were allegedly not paid for performing certain tasks.  First, opt-in Kimberly Holbrook states that she worked as a "trainer" in Huntington, West Virginia, but she does not describe which Huntington call center she worked at or when she was a trainer (i.e., during or before the class period).  As a trainer, Holbrook avers that she

> was directed by upper management to train telephone representatives to be logged into the phone system and ready to handle calls exactly at the scheduled start of their shift.  I instructed telephone representatives to arrive to work early and perform a number of necessary job-related tasks, including turning on and logging into their computers, bringing up a number of software applications, and reviewing daily memos and/or emails, in order to be ready to handle a call at the beginning of their shift.

(K. Holbrook Decl. ¶ 11.)  But Holbrook does not testify that these employees were not paid for these pre-shift tasks, that "upper management" directed her to train employees to work off the clock, that she, in fact, instructed employees to work off the clock, or that she has any knowledge of the practices at other call centers.

Likewise, opt-in Rochelle Zelakiewics states that she "managed telephone representatives handling the American Express account" (but, like Holbrook, does not identify at which call center she worked) (Rochelle Zelakiewics Decl. ¶ 2), and that account representatives were not paid for performing tasks before and after their shifts and during their meal breaks.  (*Id.* ¶¶ 7-9.) She states, for example, "[b]ecause of the metrics on which telephone representatives were

22

evaluated, I also observed telephone representatives performing unpaid work after the end of their scheduled shift and during meal breaks." (*Id.* ¶ 8.)  But she fails to describe what these "metrics" were (and as explained in Section II.H, those metrics varied, if they existed at all), how she knew that the employees were not being paid while they performed these tasks, or why they were not paid for this time.  Nor does she claim to have any knowledge of the pay practices at other call centers.

The omissions in Plaintiffs' declarations, however, were unlikely by mistake.  Instead, if Plaintiffs had provided more detail, it would have highlighted differences even among the named and opt-in plaintiffs.  But Plaintiffs cannot avoid their burden of demonstrating that they and the putative class were subject to a company-wide practice by submitting, at best, vague declarations.  *See Tussing v. Quality Res., Inc.*, No. 8:09-cv-1833, 2009 WL 4350253, at *3 (M.D. Fla. Nov. 25, 2009) (denying conditional certification in call center case where plaintiffs' affidavits were "not substantial and detailed enough" and were "largely the same affidavit signed by six different employees"); *Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *6, 10 (E.D. Wis. Sept. 11, 2008) (denying conditional certification where call center employees submitted vague declarations that failed to explain why they worked off the clock).

More importantly, even if Plaintiffs' declarations had provided more detail, their evidence would only show that 23 of approximately 52,417 account representatives—less than .05% of the potential class—were allegedly required to work off the clock.  "Such a limited sampling of employees does not support the Plaintiffs' assertion of widespread violations resulting from a common policy or plan."  *West*, 2006 WL 1892527, at *6; *see also Thompson*, 2009 WL 130069, at *2 (explaining that "if [defendant] had really made a corporate decision to refuse to pay about 8,000 putative class members for answering work-related phone calls . . .

then one would expect that more than a handful of those 8,000 putative class members would complain of being cheated by [defendant]"); *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 870-71 (S.D. Ohio 2005) (averments from two employees out of a potential class of 300 were not enough to conditionally certify a class); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) (evidence concerning defendant's pay practices with respect to two out of fifty putative class members did not amount to "even a 'modest factual showing' of a common policy or plan").

Finally, Plaintiffs rely on rulings in other call center cases to support their motion.  These cases are easily distinguishable.  The court in *Sharpe v. APAC Customer Services, Inc.*, No. 09-cv-329, 2010 WL 135168, at *2-4, 6 (W.D. Wis. Jan. 11, 2010), for example, conditionally certified a class of call center employees who all used the same electronic timekeeping system,[98] only used that system from their individual computer, and were subject to the same company-wide performance goal that required them to have a 0.5% variance between their timekeeping entries and their scheduled work hours.  By contrast, GC Services' account representatives use different timekeeping systems, clock in and out in different ways, are subject to varying grace periods, and are subject to a wide range of performance goals, if they have any at all.  *Gipson v. Southwestern Bell Telephone Co.*, No. 08-cv-2017, 2009 WL 1044941 (D. Kan. Apr. 20, 2009), and *Levy v. Verizon Information Services, Inc.*, No. 06-cv-1583, 2007 WL 1747104 (E.D. N.Y. June 11, 2007), are even more irrelevant because the call center employees in those cases, unlike here, did not record their own time and were paid based on pre-established schedules no matter how many hours they actually worked.  *See Gipson*, 2009 WL 1044941, at *2 (defendant provided all employees with pre-populated time sheets and did not permit employees to alter the

---

[98] In fact, the *Sharpe* plaintiffs expressly excluded from their proposed class one of the defendant's call centers that used a different timekeeping system.  2010 WL 135168, at *2.

time sheets to account for any pre-shift, post-shift, or non-phone activities); *Levy*, 2007 WL 1747104, at *1 (call center employees did not record their hours worked and were paid for forty hours per week regardless of how many hours they actually worked).

In short, Plaintiffs' declarations do not identify any single decision, policy, or plan that violates the FLSA, let alone a company-wide one to do so.  "Where there is no evidence of a company-wide policy, company-wide certification is inappropriate."   *Wacker*, 2008 WL 4838146, at *4.

### 2.    Statistical Analysis Of Relevant Data Establishes That Even The Named And Opt-in Plaintiffs Are Not Similarly Situated.

Plaintiffs cannot demonstrate a colorable basis that the 52,000 proposed class members at GC Services' 35 call centers were the "victims of a single decision, policy, or plan" for the additional reason that GC Services' badge swipe, time keeping, and computer log in records show that even the Plaintiffs were not victims of this so-called "decision, policy, or plan."

Plaintiffs claim that they had to begin working at least ten to fifteen minutes before their scheduled shift and before they were paid.  But account representatives could not commence work before entering the work floor of the facility, and, to do so, an account representative had to swipe their electronic security identification badge.[99]  Based on the available data for Plaintiffs, more than ten minutes elapsed between the badge swipe (when they entered the facility or work floor of it) and the log in to the timekeeping system (when they are "on the clock") only *15 percent* of the days they worked.[100]  And those ten or more minutes include time spent walking

---

[99] E. Bernhagen Decl. ¶2; J. Layne Decl. ¶ 2; T. Pena Decl. ¶ 2; J. Van Hoose Decl. ¶ 2.

[100] R. Wentland Aff. ¶ 4, Ex. A1.  All statistics discussed in this memorandum are based on data that is available for all Plaintiffs who have opted in.  As described in the Wentland Affidavit, GC Services does not have available data for all days worked for all Plaintiffs.  Further, as described in the declarations of Davidson, Watson, and Roberts, some of GC Services' timekeeping

from the entrance of the facility to the account representative's work station, placing one's belongings at the work station and getting situated, stopping at the bathroom, storing a lunch in the break room's refrigerator, and/or socializing with co-workers.[101]  Indeed, in *64 percent* of the days Plaintiffs worked, they were able to log in to the timekeeping system from the time they swiped their security badge in less than five minutes.[102]

Further, when these same statistics are considered on a facility-by-facility basis, it is clear that the three locations at which Plaintiffs worked are different from each other, thus further demonstrating that Plaintiffs are not similarly situated.  For example, at the St. Louis facility, Plaintiffs took ten or more minutes from the time they swiped their security badge to the time they logged into the timekeeping system only 8 percent of the days, and took less than five minutes on 71 percent of the days.  In comparison, Plaintiffs at the Huntington, West Virginia facilities took ten or more minutes from the time they swiped their security badge to the time they logged into the timekeeping system 30 percent of the days (or nearly four times as often as the St. Louis Plaintiffs), and took less than five minutes on 36 percent of the days (or almost half as often as the St. Louis Plaintiffs).[103]

A comparison of the two named Plaintiffs is instructive.  Erika Beasley from St. Louis took more than fifteen minutes from swiping in to clocking in only 9 percent of the days she worked.  She was able to clock-in in less than five minutes after swiping in on 76 percent of the

---

systems and badge swipe systems were not synchronized for certain periods of time.   T. Davidson Decl. ¶ 2; J. Roberts Decl. ¶ 2; B. Watson Decl. ¶ 2.  Wentland's analysis accounts for this.  R. Wentland Aff. ¶ 19.

[101] Walking to one's work station and other preliminary activities are not compensable activities under the Portal-to-Portal Act.  29 U.S.C. § 254(a).

[102] R. Wentland Aff. ¶ 4, Ex. A1.

[103] *Id.* ¶¶ 5, 7, Ex. A2, A4.

days she worked.[104]   Lora Meyers from Huntington, West Virginia took more than fifteen minutes from swiping in to clocking in on 30 percent of the days she worked, and was able to clock-in in less than five minutes 43 percent of the days she worked.[105]   Thus, the two named Plaintiffs were not even the victims of a single decision, policy, or plan.

The lack of similarity among the Plaintiffs is even more striking when the elapsed time between badge swipe and timekeeping system log in is considered in the context of how close the badge swipe is to the beginning of the day's shift.  When Plaintiffs chose to arrive at the facility or work floor between ten minutes before and five minutes after the top of the hour (the typical start time of a shift), they were able to log in to the timekeeping system in less than five minutes after they swiped their badges 84 percent of the days they worked.  But when they chose to arrive at the facility or work floor more than ten minutes before the top of the hour (which is usually the start of the shift), they clocked-in in less than five minutes after they swiped their badges in only 44 percent of the days they worked.[106]

Moreover, as shown in Exhibits G1 and G2 of the Wentland Affidavit, the average time between badge swipe and clocking in varied considerably by Plaintiff.  Some, such as Fortier in Copperas Cove, Texas, Stevens in Huntington, West Virginia, and Allen, Easley, Jones, and Williams in St. Louis, Missouri, took on average less than three minutes before they were on the clock from the time they swiped their security badge to enter the facility or work floor.  Others, however, such as Wilson in Copperas Cove, and Davis, Glass, Koster, and Wells in Huntington,

---

[104] *Id.* ¶ 13, Ex. E1.

[105] *Id.* ¶ 15, Ex. F1.

[106] *Id.* ¶¶ 8, 9, Ex. B1.

took on average more than ten minutes from swiping their badge until they were on the clock.[107] Indeed, the ranges for the Plaintiffs as shown in Exhibit G2 further demonstrate the lack of a common practice.  Take Plaintiff Koster, for example.  While the time between her arrival at the facility and the time she was on the clock was 14 minutes on average, on some days that elapsed time was 24 minutes, and on others it was two minutes.[108]  She is not even similarly situated to herself.  Thus, to the extent that the "single decision, policy, or plan" is a requirement that account representatives arrive at work ten to fifteen minutes before they are "on the clock," Plaintiffs are not even similarly situated to each other.

Data for the Plaintiffs from the St. Louis facility—the call center at which the original named Plaintiff Easley and the new first named Plaintiff Beasley worked—further demonstrates the lack of a colorable basis of a "single decision, policy, or plan."  At that call center (as well as some other third-party collection facilities), it is not possible for an account representative to do any work on a computer before logging into the Star work application system.[109]  Conceivably, an account representative could perform work off the clock through Star before logging into the timekeeping system, but this happened only ten percent of the days worked for the St. Louis Plaintiffs,[110] hardly a colorable basis for a "single decision, policy, or plan."

---

[107] *Id.* ¶ 16, Ex. G1.

[108] *Id.* ¶ 17, Ex. G2.

[109] E. Bernhagen Decl. ¶ 6.

[110] R. Wentland Aff. ¶ 10, Ex. C1.

Plaintiffs also claim that they were required to perform work off the clock after their shifts ended, but data for the Plaintiffs from the St. Louis and Copperas Cove call centers[111] again shows that the Plaintiffs are not similarly situated to each other.  If there were some sort of "single decision, policy, or plan" of off-the-clock work, one would expect to see a large number of occasions with a lengthy period of time between logging off the timekeeping system and swiping out of the building.  But that is not the case.  Rather, St. Louis Plaintiffs took more than fifteen minutes from the time they logged off the timekeeping system until the time they left the facility (including the time it may take to pack up their personal belongings, say goodbye to coworkers, and walk out of the facility) only one percent of the days; between ten and fifteen minutes only another one percent of the days; between five and ten minutes four percent of the days; and less than fives minutes *94 percent* of the days.[112]  Copperas Cove Plaintiffs (for which there is only about 40 percent as much data as there is for St. Louis Plaintiffs) took only a bit longer to leave the facility (they swiped out less than five minutes after locking out on 71 percent of the days).[113]  If there is a colorable basis of any "single decision, policy, or plan," it is that even the Plaintiffs and opt ins themselves ceased work at about the same time they logged off the timekeeping system.

> **3.     Account Representatives' Testimony Shows Significant Differences Among Potential Class Members.**

The 185 declarations of account representatives attached to this brief establish even further differences between the potential members of the proposed collective action.  *See*

---

[111]  Those centers are the only ones at which Plaintiff worked that required account representatives to swipe their badges on the way out of the facility at the end of the day.  *Id.* ¶¶ 11, 12.

[112]  *Id.* ¶ 11 Ex. D1.

[113]  *Id.* ¶ 12, Ex. D2.

*generally* Section II, *supra.*   The declarations highlight that Plaintiffs' alleged experiences in their 25 declarations were the exception, rather than the rule.   A small sampling of the declarations is set forth below.

- Crystal Whitman (Mesa, Arizona).   Uses PeopleSoft to record her time on her own computer or someone else's, and clocks in before she launches any work systems.   Once punched in late because it took two and a half minutes to log in to the computer and clock in to PeopleSoft, but her manager adjusted her time entry to accurately reflect the time when she first attempted to clock in.[114]   Has to waive her badge in front of a card reader to enter the facility, and her badge has always been programmed so that she cannot enter the building until 14 minutes before her start time.   Even if she arrives 14 minutes before her shift, she is still not allowed on the floor until five minutes before her scheduled start time.   Has never been required to be logged in to the phone or work systems or ready to handle calls at the start of her scheduled shift.   Rather, she only has to be clocked in to PeopleSoft by her scheduled start time to be considered on time.   She is not given a grace period to clock in.   Has never been required to be on the phone, in the work system, or available to handle telephone calls for a certain percentage of the day, or been required to handle a minimum number of calls during a workday.[115]

- Nora Harris (Huntington, West Virginia).   Uses Star to record her time, which is only accessible through computers at supervisor kiosks, and clocks in before she logs on to her computer.   Used to arrive at the call center thirty minutes before her scheduled shift to socialize in the break room.   Has never been required to be logged in to the phone or work systems or ready to handle calls at the start of her scheduled shift to be considered on time.   Instead, as long as she is clocked in to Star within seven minutes of her scheduled start time, she is considered on time and does not get an occurrence.[116]   Is eligible for incentive pay if she is available to handle calls for 90% of the workday.   At the end of her shift, the very last thing she does is clock out of Star through a supervisor workstation and leave the building.[117]

- Sommer Durbin (St. Louis).   Used to record time through Star but now does so through PeopleSoft.   Always clocks in before pulling up any work systems or performing any of her job duties.   Has never been considered tardy or subject to discipline if she is not logged in to the work system or dialer by the start of her shift.   Instead, whether she is considered tardy and subject to discipline is based solely on when she clocks in to the timekeeping system.   Is given a 5-minute grace period to clock in and often arrives at the

---

[114] C. Whitman Decl. ¶¶ 2-5.

[115] *Id.* ¶¶ 7-10.

[116] N. Harris Decl. ¶¶ 2-3, 5, 7.

[117] *Id.* ¶¶ 9-10.

call center right at the start of her scheduled shift or even a few minutes after it.[118]  Has never been allowed to remain at her desk or on the floor during her breaks.  Has never been required to be on the phone, in the work system, or available to handle calls a certain percentage of the day, or been required to handle a minimum number of calls during a workday.  If a call extends past her scheduled shift, she stays on the call until it is complete, finishes up any paperwork, closes out of the work applications, and then the last thing she does is clock out of PeopleSoft.[119]

• Damaris Perez (Lakeland, Florida).  Has the option of clocking in to Kronos through one of the wall clocks at the center, someone else's computer, or his own computer.  Almost always clocks in through a wall clock when he arrives at the center, so he is clocked in before he even goes to his desk and computer for the day.[120]  Has never been required to be logged in to the work systems or ready to handle calls by the start of his shift.  Rather, only has to clock in within seven minutes of his start time.  Is not expected to be on the phone, in the work system, or available to handle calls a certain percentage of the day, or to handle a minimum number of calls during a workday.  Works an 8-hour shift and is given 40 minutes of paid break time, including for lunch.[121]

The above declarations are a small sampling of the account representatives who have submitted declarations in this case.  Nevertheless, these declarations highlight that Plaintiffs' experience of working off the clock was uncommon, if it happened at all.  Lest there be any doubt, GC Services respectfully suggests that the Court compare and contrast some of the other declarations submitted with this brief with those submitted by Plaintiffs.  Those declarations show that the alleged off-the-clock work of the Plaintiffs (if, given their conclusory nature, they are believed) was a rare occurrence and atypical of the experience of the class they seek to certify.  Thus, Plaintiffs and the proposed class members are not similarly situated.

---

[118] S. Durbin Decl. ¶¶ 2-3, 8.

[119] *Id.* ¶¶ 7, 9, 11.

[120] D. Perez Decl. ¶¶ 2, 4.

[121] *Id.* ¶¶ 6-8.

Accordingly, Plaintiffs have not established a colorable basis for their claim that they and the putative class members were the victims of a single decision, policy, or plan that caused them to be deprived of overtime compensation.

### C.    Plaintiffs' Proposed Collective Action Is Unmanageable.

In order to grant Plaintiffs' motion, this Court must satisfy itself that the case is "manageable as a collective action." *Saleen*, 2009 WL 1664451, at *8. This is because courts appreciate that it "would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." *Freeman,* 256 F. Supp. 2d at 945. For example, in *Ray*, 1996 WL 938231, at *4-5, the court found manageability concerns warranted denial of conditional certification because the proposed class consisted of over 1,000 current and former employees who worked at thirty-nine different properties. *See also Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 467 (D. N.J. 1988) ("Manageability of a jury trial in which there would be more than 1300 separate trials would not be possible.").

The manageability concerns here are far greater than those presented in *Ray*. Plaintiffs seek to certify a class of more than 52,000 employees who worked in 35 different calls centers across the country. The logistical difficulties of managing such a large and diverse case would only be exacerbated by the various experiences of these employees. Accordingly, "increasing the size and expense of this case by issuing court-facilitated notice to all [52,000] potential opt-ins . . . is an inefficient method of proceeding where the evidence at this stage suggests such variation." *Saleen*, 2009 WL 1664451, at *9.

**D.      Plaintiffs Have Not Established That Putative Class Members Are Interested In Participating In This Lawsuit.**

Finally, Plaintiffs must show sufficient interest among putative class members in joining the lawsuit to obtain conditional certification.  *See Robinson v. Dolgencorp, Inc.*, No. 5:06-cv-122-OC-10GRJ, 2006 WL 3360944, at *3 (M.D. Fla. Nov. 13, 2006) (plaintiffs must demonstrate "(1) the existence of other employees who desire to 'opt-in', and (2) that those employees are 'similarly situated'").   Plaintiffs argue that they have met this requirement because "[a] total of 40 current and former GC Services employees have already joined this case" and that this "is a strong indication that there are similarly situated individuals who desire to opt-in." (Pls. Mem. at 10-11.)  They are wrong.

Out of a putative class of over 52,000 people, they have found only 40 individuals interested in joining this suit since it was filed more than six months ago, representing less than .08% of the putative class.  And these individuals only worked at four of GC Service's 35 call centers during the relevant period.  This small group is noteworthy because counsel for Plaintiffs hail from four different law firms and from three different states, Plaintiffs have advertised the lawsuit on the internet for over six months, and at least one of the opt-in plaintiffs has conducted a telephone campaign to encourage participation among potential plaintiffs.[122]   Moreover, although Darryl Easley originally filed this lawsuit, he has apparently decided not to participate any further in the prosecution of this action, as evidence by him no longer being a named plaintiff and by his failure to submit a declaration to support Plaintiffs' motion.

Such a poor showing fails to prove that a class exists—in fact, as many courts have observed, it demonstrates the opposite.  *See Thompson*, 2009 WL 130069, at *3 (certification denied where, among other matters, two plaintiffs and eight opt-ins provided, at most, evidence

---

[122] *See* E. Bernhagen Decl. ¶ 8; S. Durbin Decl. ¶ 13.

that "a tiny fraction of the 8,000 members of the putative class may not have received some of the compensation that they were due"); *Pfohl v. Farmers Ins. Group*, No. CV 03-3080 DT (RCX), 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004) (plaintiffs failed to meet burden of showing interest among putative class members where they "failed to come up with significant numbers of allegedly similarly situated employees who are likely to assert similar claims").

## IV.   CONCLUSION

Based on the foregoing, Defendant GC Services Limited Partnership respectfully requests that the Court deny Plaintiffs' Motion for Conditional Collective Action Certification and Notice.

12306024v.1

## CERTIFICATE OF SERVICE

Arthur J. Rooney, an attorney, hereby certifies that on May 17, 2010, he caused true and correct copies of the foregoing to be served via the Court's electronic filing system on the following attorneys of record in this matter:

Mark A. Potashnick
Ilya I. Ruvinskiy
WEINHAUS & POTASHNICK
11500 Olive Blvd., Suite 133
St. Louis, Missouri  63141

George A. Hanson
Richard M. Paul III
Ashlea G. Schwarz
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri  64112

J. Farrest Taylor
Angela Mason
COCHRAN, CHERRY, GIVENS,
 SMITH, LANE AND TAYLOR
163 West Main Street
Dothan, Alabama  36301

G. Patrick Jacobs
JACOBS LAW OFFICE
7020 MacCorkle Avenue, SE
Charleston, West Virginia  25304


  s/ Arthur J. Rooney

12306024v.1